# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARY K. HARRIS,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00049 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Mary K. Harris, ("Harris"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Harris protectively filed her applications for SSI and DIB on August 12, 2011, alleging disability as of August 1, 2010,[1] due to rheumatoid arthritis, ("RA"); fibromyalgia; carpal tunnel syndrome, ("CTS"); migraine headaches; depression; anxiety; panic attacks; diabetes; chronic fatigue syndrome; stomach ulcers; acid reflux; left knee pain; chronic back pain; temporomandibular joint disorder, ("TMJ"); and difficulty concentrating and staying on task. (Record, ("R."), at 118, 341-42, 345-50, 362, 370.) The claims were denied initially and upon reconsideration. (R. at 249-51, 256-58, 262-64, 266-68, 270-75, 277-79.) Harris then requested a hearing before an administrative law judge, ("ALJ"). (R. at 280-81.) A hearing was held by video conferencing on July 18, 2013, at which Harris was represented by counsel. (R. at 136-75.)

By decision dated August 13, 2013, the ALJ denied Harris's claims. (R. at 118-30.) The ALJ found that Harris met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2012.[2] (R. at 120.) She found that Harris had not engaged in substantial gainful activity since August 1, 2010, the amended alleged onset date. (R. at 121.) The ALJ found that the medical evidence established that Harris had severe impairments, namely possible/borderline diabetes mellitus; obesity (BMI about 37); possible

---

[1] Although Harris's DIB and SSI applications specify April 30, 2007, as her alleged onset date, this date was amended to August 1, 2010, the day after the ALJ's most recent decision, at Harris's July 18, 2013, hearing. (R. at 141.)

[2] Therefore, Harris must show disability between August 1, 2010, and December 31, 2012, for DIB purposes, and between September 1, 2011, and August 13, 2013, for SSI purposes.

Case 2:14-cv-00049-PMS   Document 17   Filed 08/15/16   Page 2 of 30   Pageid#: 752

fibromyalgia and inflammatory arthritis/polyarthralgia involving the back, lower extremities and upper extremities; migraines; depression; and anxiety, but she found that Harris did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 121-24.) The ALJ found that Harris had the residual functional capacity to perform simple, repetitive, unskilled light work[3] that did not require more than frequent handling, feeling, fingering and reaching overhead and that did not require more than occasional balancing, kneeling, crawling, stooping, crouching, climbing ramps and stairs and interacting with the general public. (R. at 124-25.) She further found that Harris must avoid concentrated exposure to extremely cold temperatures and avoid all exposure to hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds, working on vibrating surfaces and working around excessively loud background noise such as heavy traffic or jackhammers. (R. at 125.) The ALJ found that Harris was unable to perform her past relevant work as an accounting clerk, a tax preparer, an auto body shop manager and an office manager. (R. at 128.) Based on Harris's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that a significant number of other jobs existed in the national economy that Harris could perform, including jobs as an assembler, a packer/folder and an inspector/sorter. (R. at 128-29.) Thus, the ALJ concluded that Harris was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 130.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

After the ALJ issued her decision, Harris pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-6.) Harris then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Harris's motion for summary judgment filed July 20, 2015, and the Commissioner's motion for summary judgment filed September 24, 2015.

## II. Facts

Harris was born in 1972, (R. at 142, 341, 345), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education with one year of college instruction and past work experience as an accounting clerk, a tax preparer, an auto body shop manager and an office manager at a coal company. (R. at 142-44, 363.) Harris testified that she last worked as an accounting clerk in April 2007. (R. at 142-43.) She testified that she had RA in her hands, as well as CTS, and that a brace given to her for the CTS did not help. (R. at 143, 145.) Harris testified that she had numbness in the tips of her fingers most of the time, that she dropped things and had difficulty using a keyboard. (R. at 145, 156.) She testified that she took prednisone for her RA, which she also had in her feet, ankles, knees, hips, back, shoulders, elbows, wrists, fingers and neck, but that it caused swelling, requiring her to take Lasix also. (R. at 145, 147.) She estimated that she could walk about 200 feet at a time, stand and sit for about 15 minutes before having to change positions and lift less than five pounds. (R. at 145-46.) Harris further testified that she had diabetes, suffered from migraine headaches at least once monthly, sometimes lasting upwards of four days, had TMJ and that she experienced swelling of the legs and feet daily, requiring her

to lie down and elevate her feet for at least five hours in an eight-hour day. (R. at 146-47, 151, 160-61.) Harris testified that she took Lortab and Percocet for pain, but that they made her drowsy and "foggy." (R. at 161-62.)

Harris also testified that she suffered from depression, anxiety and mood swings, for which she took Prozac and Xanax, and for which she attended five or six counseling sessions in 2006, but had not returned because she could not afford to pay for it. (R. at 148-49, 158.) She testified that, despite taking medication, she still experienced daily crying spells. (R. at 157.) Harris also testified that she had difficulty with motivation, concentration, persistence and pace and finishing tasks. (R. at 157.) She stated that her mother had been doing the grocery shopping and paying the bills since 2010. (R. at 154.) Harris testified that, since her previous ALJ hearing, her ability to perform daily activities had gotten much worse, noting that she could no longer bend, stoop, kneel or squat due to back, knee and hip pain and an inability to get back up. (R. at 154-55.) Harris testified that she had difficulty dressing herself, and she had cut her hair short so it was not so difficult to maintain. (R. at 156.)

John Newman, a vocational expert, also was present and testified at Harris's hearing. (R. at 162-74.) Newman classified Harris's past work as an accounting clerk as sedentary[4] and marginally skilled, as a tax preparation clerk as sedentary and semi-skilled, as an auto body repair appraiser as light and skilled and as an office manager as sedentary and skilled. (R. at 164.) Newman testified that a

---

[4] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2015).

Case 2:14-cv-00049-PMS   Document 17   Filed 08/15/16   Page 5 of 30   Pageid#: 755

hypothetical individual of Harris's age, education and work history, who could perform simple, repetitive, unskilled light work that required no more than occasional climbing of ramps and stairs, balancing, kneeling, crawling, stooping, crouching and interacting with the general public, that required no more than frequent handling, feeling, fingering and reaching overhead, that did not require exposure to hazardous machinery, unprotected heights, climbing ladders, ropes and scaffolds, working on vibrating surfaces or working around excessively loud background noise, such as jackhammers or heavy traffic, and that did not require concentrated exposure to extreme cold temperatures, could not perform any of Harris's past work. (R. at 165.) However, Newman testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a packer, a laundry folder and a tester/sorter. (R. at 166.) Newman next testified that the same hypothetical individual, but who could stand and/or walk for only four hours in an eight-hour workday with positional changes every 30 to 40 minutes between sitting and standing, who had limitations with respect to the hands, who could use foot pedals frequently, who could not crouch or crawl and who should avoid stair climbing, squatting and kneeling, could not perform any of Harris's past work, but could perform the sedentary jobs of a final assembler, a packer, a stuffer, an inspector/tester/sorter and a gauger. (R. at 166-68.)

Newman further testified that, if the same hypothetical individual would miss two to four days of work monthly, she could perform neither any of Harris's past work nor any other jobs. (R. at 168.) Newman testified that this same individual, but who could stand for up to 30 minutes without interruption and sit for up to 45 minutes without interruption, who could use the upper extremities for overhead activities one-third of the day and who could use foot pedals up to one-

third of the workday, could perform the sedentary jobs previously identified. (R. at 169.) However, Newman testified that a hypothetical individual with the limitations set out in Dr. Moore's May 12, 2011, evaluation could not perform any jobs. (R. at 170, 434-38.) He also testified that an individual whose ability to grasp, turn and twist objects in both the dominant and nondominant hand was limited to 10 percent of a workday, and whose ability to perform fine manipulations with the fingers was limited to 10 percent of the workday, could not perform any competitive employment at any exertional level. (R. at 171-72.) Likewise, Newman testified that an individual with a seriously limited ability to demonstrate reliability and to maintain attention and concentration and a limited ability to follow work rules could not perform any competitive employment. (R. at 172-73.) Newman also testified that an individual who would be off-task greater than 10 percent of the workday could not sustain gainful employment. (R. at 173.)

In rendering her decision, the ALJ reviewed records from Dr. William Bell, III, M.D., a rheumatologist; Mountain View Regional Medical Center Lab; Lonesome Pine Hospital; Holston Valley Medical Center; Dr. R. Michael Moore, M.D.; Arthritis Associates; Dr. Kevin Blackwell, D.O.; Lab Corp; and B. Wayne Lanthorn, Ph.D., a licensed psychologist. Harris's attorney submitted additional medical records from Norton Community Hospital and Dr. Moore to the Appeals Council.[5]

For purposes of demonstrating Harris's medical history prior to the time period relevant to this court's decision, the undersigned takes note of the following

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

medical records. In November 2004, Harris saw Dr. William Bell, III, M.D., a rheumatologist, after testing yielded a positive rheumatoid factor of 13. (R. at 407, 419.) In both March and July 2007, Harris presented to the emergency department at Lonesome Pine Hospital with complaints of migraine headaches. (R. at 412-15.) She received Imitrex and Midrin and was discharged home in improved condition. (R. at 413-14.)

Harris began seeing her treating physician, Dr. R. Michael Moore, M.D., as early as 2004 with complaints of back pain, stomach pain and stiffness in the hands and knees. (R. at 472-76.) In 2004, Dr. Moore diagnosed her with RA, insomnia, GERD, migraine headaches, depression, acute back strain, bronchitis and asthma, and he prescribed various medications, including Percocet, Flexeril, Midrin, Zoloft, Relafen, Lortab and Ambien. (R. at 472-76.) On May 23, 2005, Dr. Moore diagnosed CTS of the right hand after Harris complained of numbness. (R. at 470.) Throughout 2005, Dr. Moore continued to diagnose RA, insomnia, depression, chronic back strain and anxiety disorder, and he prescribed Ativan and prednisone in addition to her other medications. (R. at 468-71.) In 2006, Dr. Moore added the diagnoses of right TMJ and peripheral edema. (R. at 466-67.) In 2007, Harris continued to complain of RA, anxiety and depression, and she exhibited stiffness and tenderness of the low back, as well as bilateral hand pain and swelling, in May 2007. (R. at 458-62.) In June 2007, Harris reported pain in the buttocks and back after falling in a driveway. (R. at 460.) Throughout 2007, Dr. Moore continued to diagnose anxiety disorder, RA, chronic back strain, depression and fibromyalgia syndrome. (R. at 458-62.) In 2008, Harris complained of RA, stating in December 2008 that she had low back pain, a knot in her back and "jerky" legs. (R. at 453-57.) Throughout 2008, Dr. Moore diagnosed RA, chronic back pain, anxiety disorder, depression, chronic back pain/strain and migraines and prescribed various

medications. (R. at 453-57, 515.) An MRI of Harris's lumbosacral spine, dated July 24, 2008, was normal. (R. at 516.)

On February 24, 2009, Dr. Moore completed a physical assessment of Harris, finding that she could stand/walk less than two hours and sit for about two hours in an eight-hour workday. (R. at 449-51.) He found that she must walk around every 15 minutes for five minutes, and she needed a job permitting shifting positions at will from sitting to standing to walking. (R. at 450.) Dr. Moore found that Harris would sometimes need unscheduled breaks during an eight-hour workday. (R. at 450.) He found that she could occasionally lift items weighing less than 10 pounds. (R. at 450.) Dr. Moore noted Harris's diagnoses as RA, chronic back strain and degenerative disc disease, and he deemed her prognosis as poor. (R. at 449.)

Dr. Kevin Blackwell, D.O., completed a consultative examination of Harris on August 11, 2008. (R. at 509-13.) Harris was alert, cooperative and fully oriented and did not appear to be in any acute distress. (R. at 511.) Physical examination was normal except for some slight "modeling" to the lower extremities, some numbness to the palms of both hands with touch and a positive Tinel's sign in both wrists.[6] (R. at 511.) Dr. Blackwell diagnosed Harris with probable CTS, bilaterally; multiple joint pains; fibromyalgia; depression and anxiety; hypoglycemia; and left knee pain. (R. at 511.) He opined that she could lift items weighing up to 40 pounds at a time and up to 20 pounds frequently and that she could sit for eight hours in an eight-hour workday and stand for six hours in an eight-hour workday with normal positional changes. (R. at 512.) He also found that she could bend and

---

[6] Tinel's sign refers to a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1526 (27th ed. 1988).

Case 2:14-cv-00049-PMS   Document 17   Filed 08/15/16   Page 9 of 30   Pageid#: 759

kneel up to two-thirds of the day and squat for one-third of the day. (R. at 512.) Dr. Blackwell opined that Harris could not stoop repetitively, and she could not crawl, climb ladders or work around unprotected heights. (R. at 512.)

An MRI of the lumbar spine, dated January 5, 2009, showed early facet joint arthrosis at the L3 through S1 levels of Harris's spine with no evidence of herniated nucleus pulposus or spinal stenosis. (R. at 422.)

Harris continued to treat with Dr. Moore in 2010, during which time her hands and knuckles were observed to be red and swollen, she reported that her right leg gave out, and she had a shooting pain from her thigh to her toes. (R. at 441-46.) Harris further reported that she was falling all the time, despite Neurontin helping her shakiness. (R. at 443.) In October 2010, Dr. Moore noted a dark blue spot in the lower midline of the back, where Harris was very tender, and she had positive straight leg raise testing and decreased patellar reflexes. (R. at 443.) Dr. Moore diagnosed RA, chronic back pain, anxiety disorder, migraine headaches, right lower extremity radiculopathy and degenerative disc disease. (R. at 441-46.) He prescribed Lortab, Ativan, Percocet, Maxzide, Celexa, Imitrex, Flexeril, Klonopin, Neurontin, prednisone and Lasix, and he ordered an MRI of the lumbar spine. (R. at 441-46.)

Harris presented to the emergency department at Holston Valley Medical Center on December 9, 2010, with complaints of back pain and her legs giving way. (R. at 426-32.) She was fully oriented, but in mild distress, and had a decreased range of motion in the back, as well as positive straight leg raise testing, but normal motor sensation, full range of motion, no tenderness to the lower extremities and no pedal edema. (R. at 427.) She was diagnosed with chronic low

back pain, received a Dilaudid injection and was prescribed prednisone and Percocet. (R. at 427-28, 430.)

In 2011, Harris continued to complain to Dr. Moore of RA symptoms. (R. at 439-40, 487-94, 581-86.) In March 2011, she exhibited bilateral chronic back strain, and she was tender across the lower back, worst around the midline. (R. at 439, 586.) Dr. Moore diagnosed RA, degenerative disc disease, anxiety disorder, migraine headaches and infrapatellar bursitis and continued to treat Harris with multiple medications. (R. at 439-40, 487-94, 581-86.) In April 2011, Harris complained of significant weight gain from taking prednisone and pain in all joints. (R. at 494.) Dr. Moore's diagnoses of Harris remained unchanged, and he added Klonopin to her medication regimen. (R. at 494.) Lab work dated April 27, 2011, was negative for RA factor.[7] (R. at 486.)

Dr. Moore completed another physical assessment of Harris on May 12, 2011, finding that she constantly experienced pain and/or other symptoms severe enough to interfere with attention/concentration needed to perform even simple tasks and that she was incapable of even low-stress jobs. (R. at 434-38.) He opined that Harris could walk less than one-half block, sit for 15 minutes without interruption, stand for 10 minutes without interruption and sit/stand/walk for a total of less than two hours in an eight-hour workday. (R. at 435-36.) He indicated that Harris must use a cane or other assistive device while engaging in occasional standing/walking. (R. at 436.) He opined that she could rarely lift items weighing less than 10 pounds, rarely look up and down, occasionally turn her head to the right or left and hold her head in a static position, and she could never twist, stoop (bend), crouch/squat, climb ladders or climb stairs. (R. at 436-37.) Dr. Moore

---

[7] There is a handwritten notation on this medical record that the negative reading was "probably because of prednisone." (R. at 486.)

Case 2:14-cv-00049-PMS   Document 17   Filed 08/15/16   Page 11 of 30   Pageid#: 761

opined that Harris had significant limitations with reaching, handling or fingering objects. (R. at 437.) He found that she could use both hands 10 percent of the time for grasping, turning and twisting objects, that she could use her fingers 10 percent of the time for fine manipulation activities and that she could use both arms 10 percent of the time for reaching, including overhead. (R. at 437.) Dr. Moore noted that Harris had no good days, only bad days, and he opined that she would be absent from work an average of more than four days monthly. (R. at 437.) He deemed her prognosis as poor. (R. at 434.) Dr. Moore based these findings on Harris's RA diagnosis and her symptoms of bilateral, symmetrical multiple joint pain, swelling, stiffness and burning, as well as clinical findings and objective signs, including multiple joint swelling. (R. at 434.)

On May 31, 2011, Harris complained of swelling in the lower extremities. (R. at 485, 492, 583.) She had 2+ edema in the feet, and Dr. Moore diagnosed peripheral edema and RA. (R. at 485, 492, 583.) He prescribed Percocet and Lasix, and he counseled her on increasing her water intake, discontinuing salt and elevating her feet. (R. at 485, 492, 583.) On July 26, 2011, Harris complained of RA, inability to feel her hands, her legs giving out, causing her to fall frequently, and severe panic attacks. (R. at 484, 491.) Dr. Moore diagnosed RA, chronic back strain, degenerative disc disease, anxiety disorder, migraine headaches and GERD, which he treated with medications. (R. at 484, 491.) On September 7, 2011, Harris complained of RA, noting that she fell on her left hip and knee earlier that week after her left leg gave out. (R. at 482, 489.) She also complained of back pain. (R. at 482, 489.) Dr. Moore diagnosed RA and chronic back strain, and he ordered MRIs of the lumbosacral spine and left knee. (R. at 482, 489.) On October 25, 2011, Harris again complained of RA. (R. at 410, 488, 582.) She reported that her blood sugar reading was 300 to 400 at times, she could not afford lab work and that

Neurontin upset her stomach. (R. at 410, 488, 582.) She was diagnosed with RA, chronic back pain, anxiety disorder and depression. (R. at 410, 488, 582.)

Harris saw Dr. Annette Abril, M.D., a rheumatologist at Arthritis Associates of Kingsport, PLLC, on November 16, 2011, for an initial visit. (R. at 498, 632-35.) Harris reported hand pain and swelling that had progressed to her elbows, shoulders, knees, hips and ankles, issues with her lower back, fatigue, hair loss and chronic shortness of breath, but denied muscle weakness. (R. at 632-33.) On physical examination, she was tender in the right shoulder, the left knee was tender with mild swelling, the bilateral trochanteric bursa were tender with decreased range of motion, the left ankle was tender with warmth and mild swelling and synovitis, and she was tender in the lumbosacral paraspinal areas. (R. at 634.) Dr. Abril continued Harris on prednisone and ordered a lumbar spine MRI, x-rays of the hands and feet and blood work. (R. at 634.) Blood work taken on December 6, 2011, showed a slightly elevated RA factor reading. (R. at 627.) Harris also saw Dr. Moore on December 6, 2011, at which time she exhibited multiple joint tenderness and swelling. (R. at 487, 581.) Dr. Moore diagnosed RA, chronic back pain and anxiety disorder, and he prescribed Percocet. (R. at 487, 581.)

On December 27, 2011, Dr. Shirish Shahane, M.D., a state agency physician, determined that there was insufficient evidence to fully evaluate Harris's condition, as she had failed to supply necessary information. (R. at 197.) However, based on the information available to Dr. Shahane, he deemed her not disabled. (R. at 199.)

Stephanie Fearer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on May 22, 2012, in conjunction

with Harris's claims on reconsideration, finding that she had no restrictions on her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 213.) Fearer concluded that Harris suffered from nonsevere mental impairments resulting in no major limitations in work-related functioning. (R. at 213.) The same day, Dr. Richard Surrusco, M.D., a state agency physician, completed a physical assessment, finding that Harris could perform light work that required no more than the occasional climbing of ramps and stairs, climbing of ladders, ropes and scaffolds, balancing, stooping, kneeling, crouching and crawling. (R. at 214-16.) He found Harris's allegations of TMJ, chronic fatigue syndrome, stomach ulcers, acid reflux and diabetes partially credible. (R. at 216.)

Harris continued to see Dr. Moore from January 17, 2012, through April 23, 2012. (R. at 577-80.) Over this time, she complained of RA, chronic back strain and anxiety disorder. (R. at 577-80.) On February 20, 2012, she reported having shingles the previous week, and on April 23, 2012, she reported falling two days prior. (R. at 577, 579.) Dr. Moore's diagnoses of Harris remained the same, and he continued her on prednisone, Percocet, Lortab, Klonopin and Flexeril, among other medications. (R. at 577-80.)

Harris returned to Dr. Abril on March 21, 2012, with complaints of continued joint pain and stiffness, fatigue and chronic shortness of breath, among other things. (R. at 496-97.) Physical examination revealed a tender right shoulder and left knee with mild swelling, tenderness to the bilateral trochanteric bursa, tenderness, warmth and swelling of the left ankle and tender metacarpaphalangeal, ("MCP"), joints in both wrists. (R. at 497.) Dr. Abril noted lab work showing

positive rheumatoid factor and cyclic citrullinated peptide, ("CCP").[8] (R. at 497.)
She initiated methotrexate and intended to taper Harris off of prednisone due to
long-term side effects. (R. at 497.) Harris returned to Dr. Abril on May 2, 2012,
reporting side effects from the methotrexate, including difficulty breathing. (R. at
638.) She also reported trying to taper her prednisone. (R. at 638.) Harris reported
being about the same in terms of her joints, and she continued to complain of
fatigue, chronic shortness of breath and chest pain, among other things. (R. at 638-
39.) Physical examination was the same as the previous visit. (R. at 639.) Dr.
Abril noted that a March 2012 metabolic panel and CBC were within normal
limits, she discussed adding Enbrel to Harris's medications, and she ordered chest,
hand and feet x-rays. (R. at 639.)

On May 09, 2012, Dr. Blackwell completed another consultative
examination of Harris, at which time Harris reported pain everywhere in her body.
(R. at 503-07.) She stated that she experienced migraines once monthly, which put
her "in bed three to five days," CTS, resulting in constant numbness in her fingers,
worsened with activity, depression and anxiety problems with panic attacks, Type
II diabetes and chronic fatigue syndrome, as well as torn cartilage in the left knee
and persistent low back pain. (R. at 503-04.) Harris was alert, cooperative and fully
oriented with good mental status, and she did not appear to be in any acute distress.
(R. at 505.) Her affect, thought content and general fund of knowledge appeared
intact. (R. at 505.) Physical examination revealed no labored breathing with clear
lungs, regular heart rate and rhythm without murmurs, clicks or rubs, no cyanosis
or edema of the extremities, symmetrical and balanced gait, good and equal
shoulder and iliac crest heights bilaterally, no effusions or obvious deformities of

---

[8] CCP is a circular peptide containing the amino acid citrulline. Antibodies directed
against CCP are found in people with RA. *See*
www.medicinenet.com/script/main/art.asp?articlekey=24641 (last visited August 12, 2016).

the upper or lower joints, normal size, shape, symmetry and strength of the upper and lower extremities, good grip strength, normal fine motor movements and skill activities of the hands, good and equal reflexes in the upper and lower extremities bilaterally, negative Romberg's sign[9] and intact proprioception. (R. at 505-06.) Harris was tender in the entire spine region, and she had positive Tinel's sign at both wrists. (R. at 505-06.) She stated that she could not twist or squat. (R. at 506.)

Dr. Blackwell diagnosed chronic pain, history of RA, bilateral knee pain, depression and anxiety by history and history of migraine headaches. (R. at 506.) He opined that Harris could sit for six hours, assuming positional changes every 45 minutes, and stand for four hours, assuming normal positional changes every 30 minutes. (R. at 506.) He found that she could perform overhead reaching activities with both arms for one-third of the day and foot pedal operating with both feet for one-third of the day. (R. at 506.) Dr. Blackwell found that Harris could not crouch, crawl or work at unprotected heights, and she should avoid repetitive and continuous stair climbing, squatting and kneeling. (R. at 506.) He found that she could occasionally lift items weighing up to 35 pounds and frequently lift items weighing up to 15 pounds. (R. at 506.) Dr. Blackwell imposed no limitations on Harris's hand usage. (R. at 507.) He found that Harris's range of motion was within normal limits in all areas. (R. at 502.)

Harris continued to treat with Dr. Moore from May 22, 2012, through April 25, 2013. (R. at 531-76.) Over this time, she continued to complain of RA, joint pain and deformities, muscle and joint stiffness and back problems. (R. at 531-76.) She consistently denied a decline in health, fatigue, dizziness, fainting, headaches, asthma, shortness of breath, cardiovascular difficulties, swelling of the legs,

---

[9] Romberg's sign refers to a swaying of the body or falling when standing with the feet close together and the eyes closed. *See* Dorland's at 1525.

arthritis, joint pain, back problems, joint stiffness, muscle cramps, restricted motion, weakness, depression, memory loss, mood changes, nervousness, psychiatric disorders and unsteady gait, among other things. (R. at 532, 537, 541, 545, 549, 553, 557, 561, 565-66, 569, 573.) On physical examination, Harris also consistently was relaxed and breathed without difficulty, her heart rate and rhythm were normal, and there were no murmurs, gallops or rubs. (R. at 574.) No pitting edema of the lower extremities was noted, and peripheral artery pulses were 2+ and brisk. (R. at 574.) Abdominal examination also was normal. (R. at 574.) Over this time, Harris did have both decreased range of motion of the back in both flexion and extension, as well as bilateral low back tenderness and muscle spasm. (R. at 533, 538, 542, 546, 550, 554, 558, 562, 566, 570.) Dr. Moore's diagnoses of Harris remained unchanged, and he continued to treat her conditions with medications. (R. at 531-76.) On August 27, 2012, Harris complained of right shoulder pain shooting into her fingers with occasional hand numbness, as well as worsened depression. (R. at 564.) On January 28, 2013, she again complained of neck pain radiating into the right arm and down into the right shoulder for two weeks. (R. at 544.)

On May 22, 2013, Dr. Moore completed a work-related mental assessment of Harris, finding that she had a seriously limited ability to relate to co-workers, to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 617-19.) He found that she had no useful ability to follow work rules, to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 617-18.) Dr. Moore opined

-17-

that Harris would be absent from work more than two days monthly. (R. at 619.) He based his findings on Harris's anxiety, depression and chronic pain due to RA. (R. at 617-18.) Also on May 22, 2013, Dr. Moore completed a work-related physical assessment, finding that Harris could lift items weighing up to three pounds occasionally and up to one pound frequently. (R. at 621-23.) He found that she could stand and/or walk for a total of two hours in an eight-hour workday, but for only 10 minutes without interruption, and that she could sit for a total of two hours in an eight-hour workday, but for only 15 minutes without interruption. (R. at 621-22.) Dr. Moore found that Harris could never climb, stoop, kneel, balance, crouch or crawl and that her abilities to reach, to handle, to feel and to push/pull were affected by her impairments. (R. at 622.) He found that she could not work around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 623.) Dr. Moore concluded that Harris would be absent from work more than two days monthly. (R. at 623.) He based his opinions on Harris's RA. (R. at 621-23.)

On June 4, 2013, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Harris at the request of her attorney. (R. at 646-56.) Harris reported having lived with her mother since 2008 and previously receiving psychological services from Wise County Behavioral Health Services. (R. at 648, 650.) She reported a suicide attempt while in high school, after which she was told she had a chemical imbalance, and for which she was taking medication. (R. at 650.) Harris reported that she did laundry, cooked a little and cleaned her mother's house as best she could, but her mother did the grocery shopping. (R. at 650.) She stated that she socialized primarily with her fiancé and her mother and that she watched television, but rarely read. (R. at 650.) Harris exhibited no signs of ongoing psychotic processes, delusional thinking or

hallucinations. (R. at 651.) She placed her then-current depression level at an 8 on a 10-point scale, even with medication, and she admitted to then-current suicidal ideation, but without plans or intent. (R. at 651.) She indicated often being irritable and preferring to be alone and suffering from mood swings. (R. at 651.) She reported erratic to poor concentration, mind wandering and an inability to get things done. (R. at 651.) Harris believed that her medications were negatively impacting her short-term memory. (R. at 651.)

Harris reported experiencing two to three panic attacks monthly, even with Xanax, which she, nonetheless, described as helpful. (R. at 651.) She stated that these panic attacks lasted anywhere from 15 to 30 minutes and sometimes longer. (R. at 652.) After 10 minutes, Harris could recall four out of five words presented, she could perform only one step of the Serial 7's correctly, she was able to perform Serial 3's correctly, she gave higher order and correct interpretations to three out of three commonly used adages, and she spelled "world" forward, but not backward. (R. at 652.) Harris presented with a very blunt affect, had a monotone voice, mild tremulousness in her hands, and her breathing was audible. (R. at 652.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Harris gave a good effort with valid results. (R. at 652-53.) She achieved a full-scale IQ score of 81, placing her in the low average range of intellectual functioning. (R. at 652.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), which indicated serious psychological and emotional problems. (R. at 653-55.) Specifically, test scores indicated that she had a limited ability to cope with stress, concentration and attention difficulties, memory deficits and poor judgment. (R. at 654.) Testing further revealed that Harris was experiencing a severe level of depression, which

contributed to social withdrawal and poor concentration, as well as a great deal of anxiety. (R. at 655.) Lanthorn diagnosed Harris with major depressive disorder, recurrent, moderate or greater; panic disorder without agoraphobia; and rule out somatization disorder, not otherwise specified. (R. at 655.) He assessed her then-current Global Assessment of Functioning, ("GAF"),[10] score at 55.[11] (R. at 656.) He described her mood as predominantly depressed, but with signs of anxiety. (R. at 656.)

Lanthorn also completed a work-related mental assessment of Harris, finding that she had a more than satisfactory ability to understand, remember and carry out simple job instructions. (R. at 642-44.) He found that she had a limited, but satisfactory, ability to understand, remember and carry out detailed job instructions and to maintain personal appearance, a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and no useful ability to deal with work stresses. (R. at 642-43.) He found that she would be absent from work more than two days monthly. (R. at 644.) Lanthorn based these findings on his diagnoses of Harris. (R. at 642.)

---

[10] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[11] A GAF score of 51 to 60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Harris presented to the emergency department at Norton Community Hospital on September 3, 2013, with complaints of worsening peripheral edema and shortness of breath.  (R. at 80-99.)  She denied weakness, fatigue, insomnia, chest pain, muscle weakness, joint pain or swelling, decreased range of motion, muscle spasm, back pain, memory loss, headache, depression, suicidal or homicidal ideations, anxiety and hallucinations, among other things. (R. at 97-98.) Physical examination showed decreased breath sounds diffusely and +3-4 edema of the extremities without cyanosis. (R. at 98.) There was no muscle atrophy or tenderness and no focal deficits, and Harris's mood and affect were appropriate. (R. at 98.) She was hospitalized and treated with canula oxygen and intravenous Lasix. (R. at 98-99.) A chest x-ray showed no acute cardiopulmonary changes, a CT scan of the chest showed no pulmonary embolism, but atelectasis, or partial collapse, of the lungs, and a transthoracic echocardiogram was negative for pulmonary hypertension and showed normal left ventricular, ("LV"), ejection fraction of 50-60 percent.  (R. at 88, 108-10.) Cardiac enzymes were negative.  (R. at 99.) The attending physician concluded that Harris's symptoms were likely secondary to prednisone treatment for RA. (R. at 86.) She was diagnosed with hypoxemia, leg edema, chest pain, rule out myocardial infarction, RA and Type II diabetes. (R. at 85.) She was continued on Lasix and discharged home in stable condition on September 4, 2013, with instructions to perform activity as tolerated, but to keep her legs elevated. (R. at 85-87.)

Harris continued to treat with Dr. Moore from September 25, 2013, through January 23, 2014, with continued complaints of RA, joint pain and deformities, muscle and joint stiffness and back problems. (R. at 43-62.) She denied all other physical and psychiatric symptoms. (R. at 43-62.) Physical examinations over this time were normal, except for decreased range of motion of the back, bilateral low

back tenderness and muscle spasm. (R. at 43-62.) Dr. Moore's diagnoses of Harris remained unchanged, and he prescribed Percocet, Lasix and Amaryl. (R. at 43-62.)

Dr. Moore completed another work-related physical assessment of Harris on January 23, 2014, finding that she could lift items weighing up to five pounds occasionally and up to one pound frequently. (R. at 68-70.) He found that she could stand/walk for a total of three hours in an eight-hour workday, but for only 10 minutes without interruption, and sit for a total of three hours in an eight-hour workday, but for only 30 minutes without interruption. (R. at 68-69.) Dr. Moore found that Harris could never climb, stoop, kneel, balance, crouch or crawl and that her abilities to reach, to handle and to push/pull were affected by her arthritis in the hands and wrists. (R. at 69.) He found that Harris could not work around heights, moving machinery, temperature extremes, humidity or vibration. (R. at 70.) He concluded that she would miss more than two days of work monthly. (R. at 70.) Dr. Moore based these opinions on Harris's RA, multiple joint disease, lumbago and degenerative disc disease. (R. at 68-70.) He also completed a work-related mental assessment of Harris on January 23, 2014, finding that she had a seriously limited ability to understand, remember and carry out simple job instructions and to behave in an emotionally stable manner. (R. at 73-75.) In all other areas of occupational, performance and personal/social adjustments, he found that she had no useful ability. (R. at 73-74.) Dr. Moore noted that Harris was severely limited by arthritis and constant pain and that she would miss more than two days of work monthly. (R. at 75.)

Harris returned to Dr. Moore on March 31, 2014, with complaints of chronic back strain, arthritis, joint pain and deformities and muscle and joint stiffness. (R. at 36-41.) At that time, she denied cough, wheezing, shortness of breath and leg

swelling, among other things. (R. at 40-41.) Physical examination was normal, except for a decreased range of motion of the back, bilateral low back tenderness and muscle spasm. (R. at 37-38.) In addition to all of Dr. Moore's previous diagnoses of Harris, he added plantar fasciitis despite the fact that his report is devoid of any complaint of foot pain. (R. at 38.)

On July 3, 2014, Harris presented to the emergency department at Norton Community Hospital with complaints of increased shortness of breath over the previous week, as well as increasing lower extremity edema for the previous three to four days, but she denied chest pain at the time of presentation. (R. at 21-26.) She denied all other physical and psychiatric symptoms. (R. at 22-23.) Physical examination was normal, except a cardiovascular exam showed S1 and S2 as tachycardic, and heart sounds were distant. (R. at 23.) There also was decreased air entry in the bilateral lung bases, but no wheezing, rales or rhonchi were appreciated. (R. at 23.) Harris had 2+ edema in both legs, but no cyanosis or claudication was noted. (R. at 23.) She had an appropriate mood and affect. (R. at 23.) A chest x-ray showed a mildly enlarged heart with ectasia of the aorta and vascular congestion, suggestive of heart failure. (R. at 24.) A transthoracic echocardiogram showed an acceptable LV ejection fraction and no other abnormalities. (R. at 13-14.) Harris was hospitalized and treated with intravenous antibiotics and nasal canula oxygen. (R. at 24-25.) She was discharged on July 5, 2014, in improved and stable condition on home oxygen. (R. at 9-11, 24.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*,

Case 2:14-cv-00049-PMS   Document 17   Filed 08/15/16   Page 23 of 30   Pageid#: 773

461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the

ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Harris argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Moore. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7). Harris also argues that the ALJ erred by failing to give full consideration to the findings of psychologist Lanthorn regarding the severity of her mental impairments and the resulting effects on her ability to work. (Plaintiff's Brief at 7-8.)

Harris argues that the ALJ, in arriving at her physical residual functional capacity finding, should have given controlling weight to the opinions of his treating physician, Dr. Moore. I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c), 416.927(c) (2015).

However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Here, the ALJ stated that she was giving no weight to either the mental or physical restrictions imposed by Dr. Moore, finding that they were not supported by Dr. Moore's objective and clinical findings, as well as his treatment notes. (R. at 127.) For the following reasons, I find that substantial evidence supports such a finding. Dr. Moore completed multiple physical and mental assessments of Harris. In all of these assessments, he imposed work-preclusive limitations which will not be repeated here. As the ALJ noted, Dr. Moore's treatment notes reflect largely normal findings on physical examinations of Harris. Specifically, during the relevant time period, these notes show that Harris had red and swollen hands and knuckles, tenderness to the lower midline of the back, positive straight leg raise testing, decreased patellar reflexes, 2+ edema in the feet, decreased range of motion of the back in both flexion and extension, bilateral low back tenderness and muscle spasm. However, Harris consistently was relaxed and breathed without difficulty, had a normal cardiovascular exam, exhibited no pitting edema of the lower extremities, and she had normal abdominal exams. Over this time, she specifically denied, among other things, fatigue, headaches, asthma, shortness of breath, cardiovascular difficulties, swelling of the legs, arthritis, joint pain, back problems, joint stiffness, muscle cramps, restricted motion, weakness and unsteady gait. Likewise, despite Dr. Moore's opinion that Harris's mental limitations were disabling, his treatment notes reflect diagnoses of depression and anxiety disorder,

-26-

which he treated with medications, but they do not contain any specific observations with regard to Harris's mental condition. Additionally, the only mention of psychiatric symptoms was by Harris on two occasions, during which she complained of severe panic attacks and worsened depression. Dr. Moore placed no restrictions on Harris's activities, and he did not refer her for psychiatric/psychological treatment or for mental health counseling. Moreover, treatment notes from 2012 to 2014 reflect that Harris specifically denied depression, memory loss, mood change, nervousness and psychiatric disorders.

Dr. Moore's limitations also are not supported by the other objective and clinical evidence of record.  For instance, a July 24, 2008, MRI of Harris's lumbar spine was normal, and another such MRI, dated January 5, 2009, showed only early facet joint arthrosis at the L3-S1 levels with no evidence of herniated nucleus pulposus or spinal stenosis. Although Dr. Moore ordered an MRI of Harris's lumbar spine in October 2010, there is no evidence in the record that such testing was performed. Other objective testing, including lab work from April 2011, showed negative results for diabetes, as well as a negative RA factor.

Moreover, Dr. Moore's disabling limitations of Harris are not supported by examinations performed during emergency department visits. For example, in December 2010, Harris exhibited decreased range of motion of the back and positive straight leg raise testing, but normal motor sensation, full range of motion and no tenderness to the lower extremities and no pedal edema.  She was fully oriented at that time. Additionally, on September 3, 2013, Harris had +3-4 edema of the extremities without cyanosis, no muscle atrophy or tenderness and no focal deficits. She denied memory loss, depression, anxiety and hallucinations, and her mood and affect were appropriate.  Finally, on July 3, 2014, Harris exhibited 2+

edema in both legs, but without cyanosis or claudication. She denied all psychiatric symptoms and had an appropriate mood and affect. Likewise, the physical examinations performed by the consultative sources do not support Dr. Moore's limitations of Harris. In May 2012, Dr. Blackwell's physical examination of Harris was normal, except for tenderness in the spine region and a positive Tinel's sign at both wrists. She exhibited, among other things, symmetrical and balanced gait, no effusions or deformities of the upper and lower extremities, good grip strength, normal fine motor movements of the hands, good and equal reflexes in all extremities bilaterally and normal range of motion in all areas. Dr. Blackwell noted that Harris was alert, cooperative and fully oriented with good mental status, and her affect, thought content and general fund of knowledge were intact. In May 2012, state agency physician Dr. Surrusco noted that Harris had normal strength throughout, normal reflexes, good grip strength and normal fine motor capabilities of the hands.

Finally, Dr. Moore's disabling limitations of Harris are not supported by Harris's own descriptions of her activities of daily living, including daily meal preparation, performance of household chores, regularly leaving her home and spending time with others.

It is for all of these reasons that I find that substantial evidence supports the ALJ's decision to reject the opinions of Harris's treating physician, Dr. Moore.

Harris also argues that the ALJ erred by failing to give full consideration to the opinions of psychologist Lanthorn regarding the severity of her mental impairments and their resulting effects on her ability to work. I agree. In his decision, the ALJ stated that he was giving "no weight to [psychologist]

Lanthorn's opinion that the claimant would miss more than 2 workdays per month," as it was based on one consultative examination, which was performed at the request of Harris's counsel, and it was not supported by the totality of the evidence. (R. at 127-28.) Lanthorn, however, further opined, among other things, that Harris had a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and no useful ability to deal with work stresses. Nonetheless, the ALJ did not state that these opinions had been considered or the weight he was according to such opinions. As stated herein, it is well-settled that the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). Thus, I

find that the ALJ's incomplete analysis of psychologist Lanthorn's opinion, and the weight given thereto, does not allow the court to properly scrutinize the record to determine whether substantial evidence supports his conclusions.

Based on the above reasoning, I conclude that substantial evidence does not support the ALJ's analysis with regard to Harris's mental residual functional capacity, and I, therefore, further find that substantial evidence does not exist in the record to support the ALJ's conclusion that Harris was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     August 15, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE